**HYDRA–MAC, INC., International Harvester Company, Respondents,**

v.

**ONAN CORPORATION, Appellant.**

**No. C9–88–662.**

Court of Appeals of Minnesota.

Nov. 1, 1988.

Review Granted Jan. 13, 1989.

Craig W. Gagnon, Mark P. Wine, David L. Bishop, Oppenheimer Wolff & Donnelly, Minneapolis, for Hydra–Mac, Inc.

John Q. McShane, Janice K. O'Grady, Mary T. Novacheck, Bowman and Brooke, Minneapolis, for Intern. Harvester Co.

Lawrence J. Field, Harold D. Field, Jr., Marc D. Simpson, Leonard, Street and Deinard, Minneapolis (Henry H. Feikema, Stacey A. DeKalb, Smith, Juster, Feikema, Malmon & Haskvitz, Chartered, Minneapolis, of counsel), for Onan Corp.

Heard, considered, and decided by WOZNIAK, C.J., and LANSING and KALITOWSKI, JJ.

## OPINION

WOZNIAK, Chief Judge.

Respondents Hydra–Mac, Inc. (Hydra–Mac) and International Harvester Company (IH) commenced this action against appellant Onan Corporation (Onan) concerning engines purchased from Onan for front end loaders. Both respondents asserted claims for breach of warranty. Hydra–Mac also asserted a claim of fraud.

Following a jury verdict in favor of Hydra–Mac and IH on all claims, the trial court denied Onan's post-trial motions for judgment notwithstanding the verdict, or in the alternative, a new trial, amended or additional findings of fact, or remittitur. Onan appeals from the portion of the judgment awarding $1,881,023 in lost profits and $3,000,000 in punitive damages to Hy-

dra–Mac and $2,751,000 in lost profits to IH. We affirm.

## FACTS

### BACKGROUND

Onan manufactures the "NH" series of small internal combustion engines. From 1969 through 1974, Hydra–Mac, a small skid steer loader developer and manufacturer, purchased NH engines from Onan for use in its loaders.

During 1974 and 1975, Hydra–Mac's Bruce Steiger designed the 8C, Hydra–Mac's latest model of skid steer loader. In the early 1970's, Onan developed a new aluminum NH engine called the "NHCV." Steiger testified that Onan's sales engineer, Milt Mosimann, and an Onan brochure touted the NHCV as a more durable, cooler, quieter, and more reliable engine. As the result of Onan's claims about the NHCV, Hydra–Mac was induced to incorporate it into the 8C and began to purchase NHCV's in November of 1975.

In 1975, IH agreed to purchase 8C's from Hydra–Mac for marketing as the IH Model 4130 skid steer loader. Onan acknowledged by letter IH's participation in the project. IH began to receive loaders in February of 1977.

Between November 1975 and July 1979, Onan delivered approximately 2,556 NHCV engines to Hydra–Mac. In total, Hydra–Mac purchased approximately 2,600 engines. IH purchased a total of 1,045 loaders.

#### The NHCV experience

*Hydra–Mac:* Problems with the NHCV began when Hydra–Mac's first two test engines failed. When the first engine failed, Onan claimed it suffered from a manufacturing defect. When the second failed, Onan, after weeks of testing the failed engine, said that its suggested "fix" would alleviate the problem. Again, Onan endorsed the NHCV for use in the 8C despite Onan engineer Milt Mosimann's opinion that the engine was not appropriate for such use, a fact not known by Hydra–Mac until trial. Mosimann testified that Onan executives did not pull the NHCV because

they wanted to test a prototype in the new 8C. Onan did not reveal Mosimann's opinion to Hydra–Mac, nor did Mosimann for fear of losing his job.

In the spring of 1976, Hydra–Mac's customers and dealers complained about severe problems such as high oil consumption, overheating, head gasket blowout, warped cylinder blocks, detonation, carburetor problems, and low power.

In 1976, Onan began its long line of proposed solutions. According to Steiger, Onan first suggested one, and then two, Belleville washers. The engines continued to fail. Onan recommended adjustments in the level or pattern of torque and a side-draft carburetor to replace the down-draft carburetor. By the end of 1977, Hydra–Mac had received over 100 reports of engine failures.

In mid–1978, because of continued problems and complaints, Hydra–Mac abandoned the NHCV for 8C's to be manufactured for Hydra–Mac dealers. Onan continued its fix program for 8C's which had already been sold and for new 8C's to be sold to IH. On February 6, 1978, Onan first began to include a disclaimer on the back of its invoices to Hydra–Mac. It provided:

> Onan extends to the original purchaser of goods for use Onan's current Limited Warranty, a copy of which has been provided to Purchaser and a copy of which will accompany the product. THERE IS NO OTHER EXPRESS WARRANTY. IMPLIED WARRANTIES INCLUDING MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE ARE LIMITED TO PERIODS OF WARRANTY SET FORTH IN THE PRINTED WARRANTY AND TO THE EXTENT PERMITTED BY LAW, ANY AND ALL IMPLIED WARRANTIES ARE EXCLUDED.

In mid–1979, Onan informed Hydra–Mac that a graphoil gasket would greatly alleviate the problems. In a letter to Hydra–Mac and IH, Onan stated that the NHCV would never be completely free from heat problems, but Onan did not reveal Onan

engineer Tom Schmidt's conclusion that the graphoil gasket would not help because the NHCV was "a [terrible] engine with not enough power in the first place."

Hydra–Mac's sales figures for its entire skid steer loader line declined sharply through 1981. The graphoil gasket reached the market in significant numbers in late 1980. By mid–1981, Hydra–Mac realized the graphoil gasket would not solve the NHCV's problems.

*International Harvester:* Before purchasing the 8C's, IH investigated the 8C's test history and warranty performance with the NHCV. IH discovered low power, head gasket failures, and high oil consumption. At trial, IH claimed that it was induced by Onan to accept 8C's after a meeting among the three parties. According to IH, Onan represented that design changes would solve the problems.

Soon after it began selling IH 4130's, IH received complaints from customers and dealers. According to testimony at trial, Onan assured IH the problems could and would be corrected. By early 1979, IH's dealers refused to carry other IH models because of the problems with the 4130's. Onan tried the same unsuccessful fixes it was using at Hydra–Mac. Even after the final fix, the graphoil gasket, IH continued to have a failure rate of 15–20%. One of Onan's internal documents stated that a five percent failure rate was too high.

At trial, IH claimed it continued to order loaders through much of 1979 because it relied on Onan's representations that the graphoil gasket would remedy the problem in the delivered machines. Onan continued to discuss a reimbursement program as late as May of 1982. Hydra–Mac and International Harvester filed suit in 1983 after determining there would be no solution in the near future.

### Evidence of fraudulent concealment

In addition to Onan's concealment of opinions from its engineers Schmidt and Mosimann about the NHCV, Hydra–Mac and IH presented other evidence that Onan knew the NHCV could not be repaired and had been a bad engine from the beginning.

Several internal documents showed Onan employees recognized the NHCV's problems. Onan did not publish its report, the *NH Engine,* completed simultaneously with Hydra–Mac's agreement to purchase the NHCV's. The report concluded the NHCV potentially had the very problems experienced later. Rather, Onan provided Hydra–Mac with a brochure *promoting* the NHCV. ·

Onan's former Applications Engineer Bart Anderson testified that in 1976, Onan's Executive Vice President Clark Wilson broke away from a good will tour for Steiger of Hydra–Mac at Onan's facilities to meet with several Onan engineers. He expressed concern about the damage Onan could do to Hydra–Mac if Onan did not fix the engine. Wilson told the engineers that Hydra–Mac's potential loss, although small for Onan, was large for Hydra–Mac.

Finally, Anderson testified that in mid–1976, he told Onan executives, after he had studied the engine for only a day, that the NHCV had incurable design problems. In response, Onan told Anderson to design "band-aid fixes" as problems arose rather than having him redesign the entire engine immediately; hence, Onan's fix program. Anderson also testified that his engineering group began to design three new engines to replace the NHCV, but Onan later cancelled the design program. Onan continued to propose fixes and to tell Hydra–Mac that it would fix the engines.

### Evidence of lost profits

Hydra–Mac and IH each presented expert testimony on the amount of their lost profits. Onan did not offer any rebuttal evidence.

On appeal, Onan argues the trial court erred in its finding that Onan's disclaimer did not apply to Hydra–Mac or IH and that Onan waived the statute of limitations defense. Onan also contends that the trial court erred in finding that Onan made fraudulent promises to repair through 1981, concealed the irreparable nature of the NHCV engine until 1981, and induced both respondents to detrimentally rely on Onan's promises to fix the engines.

Additionally, Onan maintains that, contrary to the trial court's findings, it did not make express and implied warranties to both respondents. Finally, Onan challenges the trial court finding that there was sufficient evidence to support the jury's damage awards.

### ISSUES

1. Did the trial court err in determining the warranty disclaimer did not apply to respondents?

2. Did the trial court err in deciding waiver precluded application of the statute of limitations?

3. Was there sufficient evidence to support the jury's award of lost profits and punitive damages?

### ANALYSIS

#### I.

*Warranty disclaimer*

The language of a contract should be interpreted in the context of the entire agreement. *Metro Office Parks Co. v. Control Data Corp.*, 295 Minn. 348, 352, 205 N.W.2d 121, 124 (1973); *Reliable Metal, Inc. v. Shakopee Valley Printing, Inc.*, 407 N.W.2d 684, 687 (Minn.Ct.App.1987). A court must give plain meaning to the words of the contract. *Albany Roller Mills, Inc. v. Northern United Feeds and Seeds, Inc.*, 397 N.W.2d 430, 432 (Minn.Ct. App.1986) (citing *Bobich v. Oja*, 258 Minn. 287, 294, 104 N.W.2d 19, 24 (1960)).

#### a. *Hydra–Mac*

■ Onan asserts that the trial court erred in finding that the disclaimer did not apply to Hydra–Mac. Onan and Hydra–Mac agree that the first line of the disclaimer extends Onan's limited warranty to the ultimate user (consumer) of the NHCV's. The dispute centers around whether "Purchaser" refers only to the ultimate user or if it also refers to Hydra–Mac.

Onan claims that "Purchaser" refers to Hydra–Mac and, as a result, the remainder of the disclaimer applies to Hydra–Mac.

The trial court found the plain meaning of the disclaimer to be that it applied only to ultimate users. We agree. Paragraphs one through five and seven through fifteen of the invoice refer to Hydra–Mac as "Buyer." The only time the word "purchaser" appears in the invoice is in Paragraph 6A, the warranty portion of the invoice. Paragraph 6A addressed the "purchaser of goods for use," not the "Buyer." The references to "Purchaser" and "purchaser of goods for use" did not refer to Hydra–Mac.

Onan's contention that it would be illogical to provide a copy of the disclaimer to Hydra–Mac if it did not also apply to Hydra–Mac does not alter the language of the disclaimer. Onan concedes its limited warranty did not cover Hydra–Mac. The disclaimer states that the ultimate user was covered by the limited warranty. To claim that the rest of the disclaimer applied to Hydra–Mac, a party that would not be the ultimate user, and thus, not covered by the disclaimer, is illogical.

■ Even if the disclaimer applied to Hydra–Mac, inconsistent express warranties made by Onan control. An express warranty may be created by:

\* \* \* \* \* \*

(a) any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain \* \* \*.

Minn.Stat. § 336.2–313, subd. (1)(a) (1986). The jury found that Onan made express warranties to Hydra–Mac.

The words or conduct of an express warranty should, whenever reasonable, be construed as consistent with each other. Minn.Stat. § 336.2–316, subd. (1) (1986). When words of an express warranty and a disclaimer cannot be reconciled, the language of the express warranty must prevail. *Wenner v. Gulf Oil Corp.*, 264 N.W. 2d 374, 384 (Minn.1978). *See also Northern States Power Co. v. ITT Meyer Industries*, 777 F.2d 405, 412 (8th Cir.1985) (applying Minnesota law). Whether an express warranty has arisen from the language and circumstances of a transaction is a jury question, and a court will not

disturb the jury's verdict unless the evidence fails to establish existence of an express warranty. *Northern States Power Co.*, 777 F.2d at 411.

Express warranties made by Onan about the quality, durability, and reliability of the NHCV before Hydra–Mac agreed to purchase the NHCV's were inconsistent with Onan's disclaimer. Onan also made later warranties about its ability to repair the engines. We believe Onan's express warranties, made before and after the parties' agreement, bind Onan.

■ Nevertheless, even if the disclaimer applied to Hydra–Mac, we believe the jury's finding of fraud supports the entire verdict. The jury found by special verdict that Onan had breached express warranties and committed fraud. Fraud is unique in that proof of some form of misrepresentation is essential. *St. Croix Printing Equipment, Inc. v. Rockwell International Corp.*, 428 N.W.2d 877, 881 (Minn.Ct. App.1988). It would be a distortion in the law if a cause of action for fraud could not be asserted where a contract validly disclaimed all warranties. *Id.* (citation omitted). "The tendency is clearly to treat the misrepresentation action as a separate matter from the contract." *Id.* (citing Prosser & Keeton, *The Law of Torts* § 109 at 764 (5th ed. 1984)).

The remedies for fraud, however, include all of the remedies available in breach of warranty cases. Minn.Stat. § 336.2–721 (1986). They also include punitive damages in appropriate cases. Onan fraudulently concealed the true nature of the NHCV. Hydra–Mac may recover lost profits and punitive damages for fraud regardless of the disclaimer.

b. *International Harvester*

■ Onan argues that the disclaimer on the invoices sent to Hydra–Mac applies to International Harvester as a third party beneficiary.

A seller's warranty whether express or implied extends to any person who may reasonably be expected to use, consume or be affected by the goods and who is injured by breach of the warranty. A seller may not exclude or limit the operation of this section.

Minn.Stat. § 336.2–318 (1986). No Minnesota court has interpreted the effect of a warranty disclaimer on a third party beneficiary of a contract.

Onan contends that the Wyoming Supreme Court's decision in *Western Equipment Co. v. Sheridan Iron Works, Inc.*, 605 P.2d 806 (Wyo.1980) is controlling. In *Western Equipment*, the Wyoming court held that the Wyoming statute identical to section 336.2–318 creates a cause of action for third party beneficiaries, but still allows seller to disclaim warranties. *Id.* at 810. *See also* U.C.C. § 2–318 Comment 1 (1978). Disclaimers in a contract of sale may be equally operative against third party beneficiaries. However, the disclaimer in this case did not apply to Hydra–Mac. Consequently, despite section 336.2–318 and the decision in *Western Equipment*, neither is applicable.

Additionally, IH never received the invoices containing the disclaimer. We decline to bind IH to a disclaimer it never received, particularly since from the beginning Onan had knowledge of IH's proposed purchase and sale of loaders using Onan's NHCV engine. The trial court did not err in finding that the disclaimer did not apply to International Harvester.

## II.

*Statute of Limitations*

a. *Breach of Warranty*

A cause of action for breach of warranty accrues on the date when breach occurs and must be asserted within four years. In a breach of warranty case, the breach occurs at the time of tender of delivery. Minn.Stat. § 336.2–725 (1986); *Valley Farmers' Elevator v. Lindsay Brothers Co.*, 398 N.W.2d 553, 557 (Minn.1987); *Vasek v. Warren Grain & Seed Co.*, 353 N.W.2d 175, 177 (Minn.Ct.App.1984).

In this case, the statute of limitations would ordinarily begin to run at tender of each group of engines and would have barred recovery on purchases of engines

occurring more than four years before commencement of this action on July 21, 1983. However, the trial court found Onan had concealed the irreparable nature of the engines through 1981 and that Hydra–Mac and IH did not discover the irreparable nature of the engines until 1981.

### 1. *Waiver*

■ The trial court refused to submit jury instruction on the issue of the statute of limitations because the court found Onan had waived the defense. A defendant waives the statute of limitations by failing to plead the defense or by pleading the defense and then presenting an inconsistent theory at trial. *Christenson v. Argonaut Insurance Co.*, 380 N.W.2d 515, 519 (Minn.Ct.App.1986), *pet. for rev. denied* (Minn. March 27, 1986) (citing *Rehberger v. Project Plumbing Co., Inc.*, 295 Minn. 577, 205 N.W.2d 126 (1973)); *City of St. Paul v. Bielenberg*, 164 Minn. 72, 204 N.W. 544 (1925). A defendant also waives the statute of limitations by concealing its position until the close of the evidence. *McMahon v. Eli Lilly & Co.*, 774 F.2d 830, 837 (7th Cir.1985).

In *McMahon*, under circumstances similar to this case, the court held that defendant's failure to present evidence on the issue of the statute of limitations amounted to waiver of the defense. The court based its decision on equitable considerations and its belief that defendant did not present evidence on the issue as a matter of strategy. 774 F.2d at 837–38.

After filing its answer, Onan did not raise the issue of the statute of limitations again until its directed verdict motion at the close of all the evidence. It did not include the defense in its pretrial statement of the issues and failed to submit written jury instructions on the issue. The trial court found that Onan did not present evidence on the limitations question as a matter of strategy because if Onan had presented evidence on the issue, evidence regarding fraudulent concealment would have been necessary to determine when the statute began to run.

Onan's contention that it did not waive the defense because it pleaded the defense, raised it in writing in its directed verdict motion, and orally requested a jury instruction on the issue is without merit. Onan made a strategic choice not to present evidence on the statute of limitations. We agree with the trial court that in so doing, Onan waived its right to assert the statute of limitations defense.

### 2. *Estoppel*

■ Even if Onan did not waive the statute of limitations defense, Onan was estopped from asserting it. To invoke the doctrine of equitable estoppel, plaintiff must show defendant made representations or inducements upon which plaintiff reasonably relied, and plaintiff will be harmed if the court does not apply the doctrine. *Northern Petrochemical Co. v. United States Fire Insurance Co.*, 277 N.W.2d 408, 410 (Minn.1979); *Bethesda Lutheran Church v. Twin City Construction Co.*, 356 N.W.2d 344, 349 (Minn.Ct.App.1984), *pet for rev. denied* (Minn. February 5, 1985). Continuous promises to repair that discontinue only after the limitations period has run equitably estop the defendant from asserting the statute of limitations. *Bethesda Lutheran*, 356 N.W.2d at 350.

The facts in this case are more compelling than those of *Bethesda Lutheran*. The trial court found that Onan continually promised to repair the engines at least through mid–1981. Unlike the defendant in *Bethesda Lutheran*, Onan made those promises with the knowledge they were false. That Hydra–Mac and IH did not file suit until 1983 does not prevent application of the theory of estoppel. *See Colorado–Ute Electric Association, Inc. v. Envirotech Corp.*, 524 F.Supp. 1152 (D.Colo.1981) (holding that defendant's repeated promises and efforts to repair tolled the statute of limitations which started to run on date of delivery). The trial court did not err in finding Onan was estopped from asserting the statute of limitations.

### 3. *Repair theory*

■ Promises of future action are enough to toll the statute of limitations. *Sohns v. Pederson*, 354 N.W.2d 852, 855 (Minn.Ct.App.1984) (citations omitted). Onan contends that its promises to repair

may have tolled the statute, but diligence required Hydra–Mac and IH to file suit within a reasonable time.

We find the cases cited by Onan to be unpersuasive. Therefore, we apply the rule applied by this court in *Sohns*. Onan's promises to repair the engines, made through 1981, tolled the statute of limitations.

#### 4. *Fraudulent concealment*

■ Fraudulent concealment tolls the statute of limitations until discovery or until reasonable opportunity for discovery. *Holstad v. Southwestern Porcelain, Inc.*, 421 N.W.2d 371, 374 (Minn.Ct.App.1988). Fraudulent concealment occurs when a defendant knows its representations are false or if it makes representations with reckless disregard for the truth. *Id.* The trial court found that Onan's fraudulent concealment of the irreparable nature of the engines tolled the statute of limitations.

Hydra–Mac and IH produced a substantial amount of evidence that Onan concealed the irreparable nature of the NHCV. After Hydra–Mac and IH reported the engine failures, Onan continued its elaborate "fix" program despite internal documents stating the engine could never be fixed.

Although the problems with the NHCV were numerous, respondents could not have suspected, and had no reasonable opportunity to discover, Onan's fraudulent concealment. Many admissions about the NHCV's problems were contained in several internal documents, making discovery difficult. There was no reason to suspect Onan of fraud. We agree that Onan's fraudulent concealment of the permanence of the NHCV's problems tolled the statute of limitations.

#### b. *Fraud*

A cause of action for fraud must be asserted within six years after discovery of the fraud. Discovery occurs when, with reasonable diligence, the plaintiff could and ought to have discovered the fraud. Minn. Stat. § 541.05, subd. 1(6) (1986); *Couillard v. Charles T. Miller Hosp.*, 253 Minn. 418, 92 N.W.2d 96 (1958); *Blegen v. Monarch Life Insurance Co.*, 365 N.W.2d 356 (Minn. Ct.App.1985).

■ Hydra–Mac did not discover the fraud before 1977. Onan still promised "fixes" in July of 1977, six years before the complaint was filed in this case. The trial court found that Onan withheld the true extent of the problems until 1981. Before 1981, Hydra–Mac had no reason to suspect fraud. Hydra–Mac did not learn the full scope of Onan's fraud until the discovery phase of this case. Hydra–Mac's fraud claim was timely.

■ Onan argues that Hydra–Mac should have suspected fraud and thus had a duty to investigate. *Buder v. Merrill, Lynch, Pierce, Fenner & Smith*, 644 F.2d 690, 693 (8th Cir.1981). A mere lack of discovery does not extend the limitations period if there was negligence or a lack of reasonable diligence on the part of the aggrieved party. *Blegen*, 365 N.W.2d at 357 (citations omitted). Onan claims that a defrauded party cannot blindly rely on reassuring statements by the defrauding party as satisfying the duty to investigate. Onan presented no evidence that Hydra–Mac should have suspected Onan of fraud before 1977. By mid–1977, Onan had proposed only a few fixes and, with the amount of time it required to implement the fixes and see the results, Hydra–Mac was under no duty to investigate a fraud it had no reason to suspect.

### III.

#### *Sufficiency of evidence*

#### a. *Standard of review*

Onan claims there was not sufficient evidence to support the jury's award of lost profits and punitive damages. In its post-trial motions, Onan moved for a judgment notwithstanding the verdict or a new trial. In reviewing a motion for JNOV, this court must decide whether there is any competent evidence reasonably tending to support the verdict. *Blue Water Corp. v. O'Toole*, 336 N.W.2d 279, 281 (Minn.1983); *Imdieke v. Blenda–Life, Inc.*, 363 N.W.2d 121, 124 (Minn.Ct.App.1985). A jury's verdict will be upheld if there is any competent

evidence in support of it. *Blue Water Corp.*, 336 N.W.2d at 281.

A motion for a new trial based on sufficiency of the evidence will not be granted unless:

> the preponderance of the evidence [implies] that the jury failed to consider all the evidence or acted under some mistake or from some improper motive, bias, feeling or caprice, instead of honestly and dispassionately exercising its judgment.

*LaValle v. Aqualand Pool Co.*, 257 N.W. 2d 324, 328 (Minn.1977).

### b. *Lost profits*

To recover lost profits, a plaintiff must prove the cause and amount of its loss with reasonable certainty. *Polaris Industries v. Plastics, Inc.*, 299 N.W.2d 414, 419 (Minn.1980); *Duchene v. Wolstan*, 258 N.W.2d 601 (Minn.1977). Once a plaintiff raises a reasonable inference as to the amount of damages caused by the defendant, the defendant is liable for that amount unless he or she presents evidence to rebut the inference and to establish that other factors caused the loss. *LeSueur Creamery, Inc. v. Haskon, Inc.*, 660 F.2d 342, 351 (8th Cir.1981), *cert. denied*, 455 U.S. 1019, 102 S.Ct. 1716, 72 L.Ed.2d 138 (1982) (applying Minnesota law).

### 1. *Hydra–Mac's evidence*

Onan asserts that the evidence presented at trial on the issue of damages was insufficient to support the jury's awards of lost profits. Over Onan's foundational objection, Arthur Boll, a certified public accountant, testified that he and his staff spent 600 hours assessing Hydra–Mac's demonstrated sales performance from 1971 to 1986. During that period, the agricultural machinery market encountered reduced capital expenditures due to the agricultural recession. After excluding lost sales due to the agricultural recession, Boll concluded that Hydra–Mac's sales losses began before the decrease in capital expenditure.

Noting a large contrast between Hydra–Mac's sales before July 1, 1980, and after, Boll testified that 1980 most accurately represented Hydra–Mac's performance before its problems with the NHCV. Boll then separated Hydra–Mac's reduced level of sales caused by the agricultural recession from the sales decrease due to the NHCV. He determined that the NHCV problem had caused a loss of 1,026 loader sales, resulting in $1,881,023 in lost profits. Also, the data relied on by Boll was compiled under a mandatory reporting system, not under a voluntary reporting system as in *Polaris*.

We believe that Hydra–Mac's evidence was sufficient to prove Hydra–Mac suffered a loss of skid steer loader sales and to raise an inference as to the amount of lost profits. Onan chose not to present any evidence in rebuttal. Rather, it relied on cross-examination to discredit Boll's testimony. The jury chose to accept Hydra–Mac's evidence. We believe the jury's verdict was based on competent evidence and there is no basis for reversal.

### 2. *International Harvester's evidence*

At trial, IH presented evidence that in 1977 it had a 4.2% share of the skid steer loader market, including Model 4130 sales. IH lost sales in the Model 4130 area and its entire line of skid steer loaders during its use of the NHCV.

Using data adjusted for the agricultural recession and compiled by the Farm and Industrial Equipment Institute (FIEI), Stanley West, International Harvester's Director of Product Planning, testified that the company's skid steer loader market declined gradually through 1984. He admitted that the data represented only information reported voluntarily by people who chose to be members of the Institute.

West translated the lost market share into lost unit sales by multiplying IH's market share by the industry's skid steer loader sales, deducted International Harvester's cost on a sale of a loader, and reached a figure of $2,751,000 in lost profits. Again, Onan did not present any evidence in rebuttal.

IH's evidence was sufficient for the jury to award lost profits to IH. Onan did not present any evidence to contradict West's

conclusions. There is no requirement that a plaintiff prove the amount of loss to mathematical precision. *Duchene*, 258 N.W.2d at 606. The jury listened to West's testimony and chose to believe it. There is no basis for reversal.

#### c. *Punitive damages*

Punitive damages may be awarded upon clear and convincing proof of the defendant's willful indifference to the rights or safety of others. Minn.Stat. § 549.20 (1986). A jury's verdict will be upheld if there is any competent evidence in support of it and will be overturned if there is evidence of passion or prejudice. *Blue Water Corp.*, 336 N.W.2d at 281; *LaValle*, 257 N.W.2d at 328. The question of passion is for the trial court. *Hennen v. Huff*, 388 N.W.2d 408, 412 (Minn.Ct.App.1986).

Onan knew the financial havoc it could inflict upon Hydra–Mac if it did not solve the engine problems quickly. Instead, Onan, despite its knowledge of the irreparable nature of the NHCV engine, continued to attempt temporary fixes, representing that the problems were solvable. It forbade its employees from telling Hydra–Mac that the problems were permanent. Onan concealed the results of its study, *NH Engine*. We believe the jury's award of punitive damages was supported by clear and convincing evidence.

Onan argues that even if there is sufficient evidence for the jury's award, this court at least should reduce the amount of the award. A court will reduce an award of punitive damages if it is unreasonable under the circumstances of the case. *Gryc v. Dayton–Hudson Corp.*, 297 N.W.2d 727 (Minn.1980).

We believe the trial court summed it up best when he noted in his post-trial memorandum:

> Punitive damages in the amount awarded are justified and supported by the evidence.
> There was a poignant moment during this trial which is not reflected in the typed pages of a trial transcript. Douglas Steiger was being cross-examined about business records that were stored

in his garage and apparently destroyed. He explained in colorless language that, at the time, his days and nights were filled with the complexities of bankruptcy proceedings and the anguish of trying to salvage the business. To stand by and to permit a business to slowly and painfully die because of an intentional fraud, concealed and allowed to work its havoc over an extended period of time, constitutes willful indifference to the rights of others.

We find that the jury's punitive damages award was reasonable, and we will not disturb it. *See Hodder v. Goodyear Tire & Rubber Co.*, 426 N.W.2d 826 (Minn.1988).

### DECISION

The trial court correctly concluded the disclaimer did not apply to Hydra–Mac or International Harvester. The trial court also was correct in finding the statute of limitations defense did not bar any of Hydra–Mac's or International Harvester's claims. There was sufficient evidence to support the jury's award of lost profits and punitive damages.

AFFIRMED.